**MINA HAKAKIAN (SBN 237666)**
mhakakian@hwlgpc.com
**HAKAKIAN WILLIAMS LAW GROUP PC**
1541 Westwood Blvd., Second Floor
Los Angeles, California 90024
Tel.: (310) 982-2733
www.hwlgpc.com

Attorneys for Plaintiff,
**DETOX LA, LLC**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **DETOX LA, LLC,** a California Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>**HEALTH CARE SERVICE CORPORATION,** D/B/A **BLUE CROSS AND BLUE SHIELD OF ILLINOIS** and **COUNTRY/IAA EMPLOYEE WELFARE BENEFIT PLAN ADMINISTRATIVE COMMITTEE**<br><br>Defendants. | **Case No.: 2:26-cv-11632**<br><br>**COMPLAINT FOR RECOVERY OF BENEFITS UNDER 29 U.S.C. § 1132(a)(1)(B) AND REASONABLE ATTORNEY'S FEES AND COSTS UNDER 29 U.S.C. § 1132(g)(1)** |

Plaintiff, Detox LA, LLC, a California Limited Liability Company ("Plaintiff," and/or "Detox LA"), alleges against Defendant Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois ("BCBS IL") and COUNTRY/IAA Employee Welfare Benefit Plan Administrative Committee ("Committee") (BCBS IL and the Committee are hereinafter jointly referred to as "Defendants") as follows:

## I. INTRODUCTION

1. Plaintiff Detox LA is a freestanding, inpatient detox and residential facility, located in Los Angeles, California, which received a valid assignment of benefits for medical detox treatment services performed and seeks redress on behalf of a patient plan member for improper denials of medical detox treatment insurance benefits.

2. Plaintiff brings this action to redress BCBS IL's pattern and practice of underpaying medically necessary detoxification treatment benefits that BCBS IL's own utilization management department authorized, in writing, as medically necessary, day by day, before and during the course of treatment, only to later pay less than five percent (5%) of billed charges, and then to compound that underpayment with an administrative process so inconsistent that BCBS IL's own correspondence cannot agree on the amount in dispute or the date of decision being appealed.

3. Plaintiff seeks recovery of benefits due under the terms of the plan pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. § 1132(a)(1)(B)).

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, and pursuant to 29 U.S.C. § 1132(e)(1) because the action seeks to enforce rights under the Employee Retirement Income Security Act of 1974.

5. This Court is the proper venue for this action pursuant to 29 U.S.C. § 1132(e)(2), which provides that an ERISA action may be brought "in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found." Here, venue is proper because the alleged underpayment and related conduct giving rise to Plaintiff's claims occurred, at least in substantial part, in this District. Plaintiff is located in this District, rendered the medical services at issue in this District, submitted the claims for those services from this District, and pursued appeals concerning the challenged benefit determinations from this District. The failure to properly pay benefits for services rendered in this District therefore constitutes conduct and an alleged breach giving rise to this action within this District.

///

6. Personal jurisdiction and venue are further proper because each Defendant conducts a substantial amount of business within the Central District of California. Venue is also proper under 28 U.S.C. § 1391(b)(2), which permits a civil action to be brought in a judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred." A substantial part of the events underlying Plaintiff's claims occurred in this District, including the provision of the medical services at issue, verification of benefits, submission and processing of the claims, and Plaintiff's appeals of the challenged benefit determinations.

7. On information and belief, the Plan documents contain a forum-selection clause purporting to designate the United States District Court for the Northern District of Illinois, and, failing subject-matter jurisdiction there, the Circuit Court of Cook County, Illinois, as the exclusive venue for disputes relating to or arising from the Plan. Neither Defendant raised, cited, or asserted this forum-selection clause in any of their extensive administrative correspondence with Plaintiff. While the Defendant Committee, acting through CC Services, eventually produced a copy of the governing Plan documents on May 20, 2025, this production occurred long after the medical services were rendered and more than five months after Plaintiff's initial written request of December 9, 2024. Prior to that delayed production, and throughout the core administrative timeline, the clause was completely withheld from Plaintiff. To the extent Defendants now seek to invoke

any such forum-selection provision to disrupt venue in this District, Defendants have waived, and are equitably estopped from asserting, that provision for the same reasons set forth in this Complaint.

## III. PARTIES

### a. The Plaintiff

8. Detox LA is a co-educational medical detox facility located in Los Angeles, California, dedicated to assisting individuals suffering from addiction in overcoming its adverse effects and beginning the path toward long-term recovery. Detox LA provides evidence-based medical detox treatment [1] and remains committed to supporting clients in achieving improved health, independence, and overall well-being by addressing the devastating impacts of addiction. Throughout its medical detox programs, Detox LA plays an active role in assisting patients in regaining their independence and beginning the path to long-term sobriety.

9. Detox LA provides a range of detox services designed to support individuals in taking the first steps toward recovery and regaining their

---

1 Medical detox treatments are clinical programs that are designed to assist individuals who have developed a physiological dependence on alcohol or drugs. When such individuals stop using a substance, they experience withdrawal, which can make recovery challenging. Medical detox provides structured care, often as the first stage of recovery, and uses various treatment methods, including medication, when necessary, to manage withdrawal and support the individual's path to sobriety.

independence, including alcohol, heroin, opiate, benzodiazepine, and comprehensive medical detox programs. Detox LA is committed to helping clients break the cycle of addiction and achieve lasting freedom from substance use disorders.

10. Detox LA is licensed and certified by the California Department of Health Care Services. The facility is licensed to provide "medically managed residential detoxification treatment" and holds an Incidental Medical Services ("IMS") license. This IMS license allows Detox LA, as a residential treatment facility, to offer limited on-site medical services that are incidental to its primary focus on substance use treatment. Through this IMS license, Detox LA can address medical issues that may arise during the detoxification and treatment process.

11. Detox LA is also accredited by the Joint Commission, signifying that the facility meets the highest national standards for quality, safety, and clinical care. The Joint Commission is an American-based, independent non-profit that accredits and certifies nearly 21,000 healthcare organizations and programs, setting standards for quality and patient safety, awarding its Gold Seal of Approval®, and conducting unannounced surveys to ensure compliance with rigorous guidelines for various settings like hospitals, clinics, and long-term care facilities. As part of maintaining Joint Commission accreditation, Detox LA is subject to standards that go beyond basic licensure and govern areas including safety, clinical care, environment of care,

medication management, staff competency, and emergency preparedness.

**b. Patient Plan Member**

12. Detox LA provided medical detox and residential treatment to a patient, referred to herein as "Patient H,"[2] who was at all relevant times an active member of the COUNTRY/IAA Employee Welfare Benefit Plan (the "Plan"), a fully insured employee welfare benefit plan sponsored by CC Services, Inc., d/b/a COUNTRY Financial ("CC Services"). CC Services is not a party to this action; as set forth below, the Plan's own governing documents designate Defendant BCBS IL, not CC Services, as responsible for benefit-claims determination, and separately designate Defendant COUNTRY/IAA Employee Welfare Benefit Plan Administrative Committee as the Plan's Administrator, as set forth immediately below.

13. Plaintiff is informed and believes that the Plan is a group health plan (a type of welfare benefit plan that is subject to the provisions of ERISA) that provides medical, basic and comprehensive dental, essential and enhanced vision, life and disability income benefits. The Plan is fully insured, and benefits are provided under

---

[2] To safeguard Patient privacy and comply with applicable confidentiality obligations, all personally identifying information has been omitted from this pleading. Plaintiff will disclose the patient's identity and related identifying details only in accordance with a duly entered Protective Order and all applicable federal and state privacy laws and regulations, including any governing HIPAA requirements. Absent such protections, Plaintiff will limit disclosures to de-identified information sufficient to state the claims and provide notice, while preserving the patient's confidentiality.

group insurance contracts entered between the Plan Sponsor and various insurance companies. Claims for benefits are sent to the insurance companies, and the insurance companies, not the Plan Sponsor, are responsible for paying claims. The insurance companies are the named fiduciaries for benefit claims and are responsible for determining eligibility for and the amount of any benefits payable under the Plan and providing the claims procedures to be followed and the claims forms to be used by eligible individuals pursuant to the Plan. The insurance companies also have the authority to require eligible individuals to provide them with such information as they determine necessary for the proper administration of benefits under the Plan.

14. Plaintiff is informed and believes that under the Plan the insurer (in this case BCBS IL, is responsible for evaluating all benefit claims under the Plan.

**c. <u>The Defendants</u>**

15. Defendants are the proper party defendants for an ERISA benefits recovery action. *See Cyr v. Reliance Standard Life Ins. Co.*, 642 F.3d 1202 (9th Cir. 2011) (en banc).

16. ERISA governs all aspects of health, mental, and medical benefits under ERISA plans and authorizes a civil action to recover unpaid and underpaid benefits and attorneys' fees. Detox LA has standing to bring this lawsuit arising from its assignment of benefits from Patient H.

17. Plaintiff is informed and believes that Defendant Health Care Service

Corporation ("HCSC") is an Illinois mutual legal reserve company with its principal place of business located at 300 East Randolph Street, Chicago, Illinois 60601. HCSC does business in the State of Illinois under the registered trade name Blue Cross and Blue Shield of Illinois.

18. Defendant BCBS IL, a Division of Health Care Service Corporation, a Mutual Legal Reserve Company, is, on information and belief, the insurer of medical benefits under the Plan.

19. On information and belief, the Plan's own documents designate the COUNTRY/IAA Employee Welfare Benefit Plan Administrative Committee, a separate entity distinct from BCBS IL, as the Plan's Administrator: "The Plan Administrator and agent for service of legal process is the COUNTRY/IAA Employee Welfare Benefit Plan Administrative Committee." The Committee is therefore the Plan's Administrator within the meaning of 29 U.S.C. § 1002(16)(A), and is the entity explicitly designated to receive and timely respond to written requests for Plan documents under 29 U.S.C. § 1024(b)(4).

20. On information and belief, the Plan designates BCBS IL, not the Committee or the Plan Sponsor, as the party responsible for the conduct at issue in this action: "The Plan is fully insured and benefits are provided under group insurance contracts entered into between the Plan Sponsor and various insurance companies. Claims for benefits are sent to the insurance companies. The insurance

companies, not the Plan Sponsor, are responsible for paying claims. The insurance companies are the named fiduciaries for benefit claims and are responsible for determining eligibility for and the amount of any benefits payable under the Plan and providing the claims procedures to be followed and the claims forms to be used by eligible individuals pursuant to the Plan." The Committee's own discretionary authority, by contrast, is limited to interpreting the general terms of the Plan: "[w]ith respect to its obligations to interpret the terms of the Plan, the Plan Administrator has discretionary authority to interpret the Plan, and the decision of the Plan Administrator shall be final, binding and conclusive." The Plan document further states that "it shall be the principal duty of the Plan Administrator to determine that the provisions of the Plan are carried out in accordance with its terms, for the exclusive benefits of person entitled to participate in the Plan."

21. Consistent with the Plan's designation of the insurer as responsible for benefit claims, BCBS IL is, on information and belief, responsible for determining eligibility for benefits, adjudicating claims, and administering the claims and appeals process for medical benefits under the Plan. CC Services has itself represented, through its Office of the General Counsel, that BCBS IL "determines all claims and handles all appeals and requests for medical benefits offered by the Plan," and that further requests for information or benefits "should be addressed to Blue Cross Blue Shield of Illinois."

22. CC Services, Inc., the Plan Sponsor, is not itself named as a defendant in this action. On information and belief, members of the Committee "may (but need not) be an officer, director or employee of the Plan Sponsor," and the Committee is appointed by, and may act through, CC Services personnel in discharging its duties as Plan Administrator. Accordingly, the correspondence described below from CC Services' Office of the General Counsel concerning Plan Administrator functions, including production of governing Plan documents, was sent on behalf of, and in the capacity of, the Committee, the Plan's actual Administrator and agent for service of legal process.

23. As set forth more fully below, the Committee failed to furnish Plaintiff a copy of the governing Plan documents for more than five months after Plaintiff's written request of December 9, 2024, a request that plainly invoked the Committee's obligations as Plan Administrator, regardless of the fact that it was directed in the first instance to BCBS IL as the Plan's claims agent. The Committee's delay in furnishing those documents further supports the Committee's status as a properly named Defendant from whom the same benefits due under the Plan may be recovered and independently supports the deemed-exhaustion and waiver allegations set forth elsewhere in this Complaint.

24. On information and belief, the Plan's governing documents explicitly direct participants and beneficiaries to bifurcate inquiries based on administrative

function, confirming that: "If you have any general questions regarding the Plan, please contact the Plan Administrator. However, if you have questions regarding eligibility for and/or the amount of any benefits payable under the Plan, please contact the appropriate insurance company." Because the current dispute turns on the Committee's failure to timely furnish governing Plan documents, the Committee's interpretive authority over the Plan's general terms, including, on information and belief, the anti-assignment provision, forum-selection clause, and contractual limitations period discussed in this Complaint, and separately on a denial of medical benefit claims and a determination of the amount of benefits payable, the Plan's own text confirms that both the Committee and BCBS IL are properly named Defendants for the distinct conduct each is alleged to have committed. The Plan expressly reserves to BCBS IL, as Claims Administrator, all authority over eligibility and the amount of benefits payable, while reserving to the Committee discretionary authority to interpret the Plan's general terms. This confirms that the Committee's status as a properly named Defendant rests on grounds independent of, and in addition to, BCBS IL's separate liability for the underlying benefit determination.

**d. <u>The Doe Defendants</u>**

25. The true names and capacities of the Defendants sued herein as DOES are unknown to Plaintiff at this time, and Plaintiff therefore sues such Defendants

by fictitious names. Plaintiff is informed and believes that the DOES are those individuals, corporations and/or businesses or other entities that are also in some fashion legally responsible for the actions, events and circumstances complained of herein, and may be financially responsible to Plaintiff for services, as alleged herein. The Complaint will be amended to allege the DOES' true status and capacities when they have been ascertained.

## IV. NON-PARTY AGENT AND/OR ADMINISTRATOR

26. Plaintiff is informed and believes that Elevance Health, Inc. (formerly known as Anthem, Inc.) is a corporate holding company organized and existing under the laws of the State of Indiana. Elevance Health, Inc. operates its various business activities in California by way of its corporate subsidiary known as Blue Cross of California d/b/a Anthem Blue Cross ("Anthem Blue Cross").

27. Plaintiff is informed and believes that Anthem Blue Cross operates in its own name and on its own behalf as a California healthcare claims administrator and insurer. In addition, Anthem Blue Cross performs services on behalf of numerous entities bearing some form of the "Blue Cross" or "Blue Shield" trademarks that carry out health insurance activities primarily outside of the State of California, including BCBS IL.

28. The BlueCard® Program is a nationwide claims system operated by the Blue Cross Blue Shield Association, which facilitates inter-plan coordination

for out-of-state medical services.[3] It contractually separates responsibilities between the Home Plan, which administers the member's ERISA coverage, and the Host Plan, which handles local claim intake and pricing.[4] The Home Plan is responsible for eligibility, utilization review, and benefit determinations, while the Host Plan applies local provider rates and transmits claims. On information and belief, BCBS IL served as the Home Plan responsible for Patient H's ERISA coverage determinations, while Anthem Blue Cross served as the Host Plan handling local claim intake in California. Consistent with this structure, Plaintiff initially attempted to pursue an appeal of the underpayment at issue with Anthem Blue Cross before being directed to pursue the appeal with BCBS IL, the Home Plan responsible for adjudicating the claim.

29. This role division, codified in BlueCard® materials, facilitates lawful fiduciary delegation and prevents unauthorized entities from exercising discretionary control. The separation is not merely administrative; it is essential to

---

3 Blue Cross Blue Shield Association is a national association of 34 independent, locally operated licensees, which collectively cover more than 109 million members in all 50 states, Washington, D.C., and Puerto Rico. The Blue Cross Blue Shield Association owns and manages the Blue Cross and Blue Shield trademarks and names in more than 170 countries around the world and grants licenses to independent companies to use the trademarks and names in exclusive geographic areas. Independence Blue Cross, *Your Trusted Blue Cross Blue Shield Association Licensee in Southeastern Pennsylvania*, https://www.ibx.com/about-us/blue-cross-blue-shield-association-pennsylvania (last visited Aug. 26, 2025).

4 *Id.* at 5.

preserving transparency, accountability, and enforceable rights under ERISA. When Host Plans exceed their limited role, or Home Plans forgo their obligations, the breakdown obscures who made the benefit determination, impedes oversight of delegated authority, and undermines the participant's ability to appeal or build an adequate administrative record. This violates ERISA's fiduciary structure by enabling unauthorized discretion without lawful delegation and by weakening the Home Plan's duty to independently exercise and monitor fiduciary authority.[5]

30. Plaintiff is informed and believes that all conduct, including claim-handling, intake, pricing transmission, and/or medical necessity determinations by Anthem Blue Cross relative to Patient H's claims, was conducted under the direct supervision, discretion, and authority of BCBS IL, and is therefore legally attributable to BCBS IL under ERISA's fiduciary and co-fiduciary liability provisions, including 29 U.S.C. §§ 1104(a) and 1105(a).

## V. CORE FACTS UNDERLYING DETOX LA'S CLAIMS FOR PAYMENT

### a. Plaintiff Obtained an Assignment of Benefits That Conferred ERISA Standing for the Claims

31. Prior to receiving care, Patient H properly conveyed and transferred all pertinent rights to Plaintiff Detox LA, through a valid written assignment (the

5 *See* 29 U.S.C. §§ 1104(a)(1), 1105(c).

"Assignment of Benefits"), including but not limited to the patient's healthcare benefit coverage rights, rights to insurance, rights to healthcare plan reimbursement, rights to appeal, and rights to sue for ERISA benefits. This document is attached as *Exhibit 1*.

32. By its terms, the Assignment of Benefits (a) authorizes and requests that payment of benefits by Patient H's insurance company be made directly to Detox LA; (b) authorizes Detox LA to disclose information to the insurer for reimbursement purposes; (c) releases Detox LA from liability arising from such disclosure; (d) provides that Patient H "agree[s] to participate and assist facility and its designated representatives with any appeal process necessary to collect payment for the services rendered"; (e) provides that "Detox LA has been appointed by [Patient H] to act as [his] representative and on [his] behalf in any proceeding that may be necessary to seek payment from [his] insurance carrier"; and (f) provides that "Detox LA shall be entitled to the full amount of its charges without offset."

33. By this Assignment of Benefits, Patient H conveyed and transferred to Plaintiff Detox LA his rights to healthcare benefit coverage, rights to Plan reimbursement, rights to appeal, and the right to act on his behalf in any proceeding necessary to obtain payment from BCBS IL, including this action.

///

///

**b. <u>Plaintiff Verified Coverage and Confirmed Benefits Were Assignable Before Admitting Patient H</u>**

34. Before admitting Patient H, Detox LA, as an out-of-network provider, verified coverage, eligibility, and applicable reimbursement rates with BCBS IL. On February 20, 2024, at 4:03 p.m., a Detox LA representative completed a full verification of benefits for Patient H's coverage under the Plan. BCBS IL's own representative, identified as "Kobe J," confirmed the verification. The content of the verification was reduced to writing by Detox LA, and a copy is attached to this Complaint as *Exhibit 2*.

35. That verification confirmed, among other things: that Patient H's coverage was active and primary; that the Plan was fully insured, with a policy effective date of January 1, 2024, on a calendar-year plan period; that residential treatment centers and freestanding facilities were covered levels of care; that Detox (H0008, H0010, H0011) and Residential (H0018, H0019) treatment were both covered out-of-network benefits, subject to precertification, with "Unlimited" applicable limitations and "State License Sufficient" accreditation requirements which Detox LA satisfied; that the applicable "Rate Type" for reimbursement purposes was the "Medicare Fee Schedule"; and that balance billing was permitted under the Plan.

36. The verification of benefits further disclosed that the only penalty

associated with any precertification failure was a "$500 penalty up to denial of claims for non-precert." As set forth below, every phase of Patient H's treatment was, in fact, timely precertified and approved by BCBS IL's own utilization management department. Accordingly, BCBS IL's later reliance on a "Non-Participating Provider" priced-amount rationale to justify allowing less than ten percent, and paying less than five percent, of billed charges bears no relationship to the only precertification-related consequence disclosed in BCBS IL's own verification of benefits and finds no support in any provision Plaintiff has been able to identify in the Plan's governing documents.

37. Critically, BCBS IL's verification of benefits expressly confirmed that the benefits under the Plan were assignable, with no restriction on assignability disclosed at any point during that call or at any other time prior to litigation.

**c. <u>Plaintiff Provided Medically Necessary Treatment in Reliance on Defendants' Verification and Authorizations</u>**

38. In reasonable reliance on BCBS IL's coverage verification, Detox LA admitted Patient H on February 23, 2024, and provided inpatient detoxification and residential treatment services through on or about March 7, 2024, consistent with the standards set forth by the American Society of Addiction Medicine ("ASAM"). Patient H's treating physician was Jason Giles, M.D.

39. The Plan's own Certificate of Coverage defines "Medically Necessary"

to mean that a specific medical, health care, supply, or Hospital service "is required [] for the treatment or management of a medical symptom or condition and that the service, supply or care provided is the most efficient and economical service which can safely be provided." The Certificate further provides that BCBS IL's determination of medical necessity is, "in most instances," made only "AFTER [THE PATIENT HAS] BEEN HOSPITALIZED OR [HAS] RECEIVED OTHER HEALTH CARE SERVICES OR SUPPLIES AND AFTER A CLAIM FOR PAYMENT HAS BEEN SUBMITTED." Here, BCBS IL did more than the Plan's own default procedure contemplates: its utilization management department made prospective, contemporaneous determinations that each successive phase of Patient H's care satisfied this Plan-defined standard, in writing, before and during treatment, not merely after the fact.

40. Contemporaneously with Patient H's treatment, BCBS IL's own utilization management department reviewed and approved, in writing, each successive phase of Patient H's care as medically necessary, including at minimum the following authorizations, all reflected in BCBS IL's own records as "Approved" and "Managed: Yes":

a. Five (5) days of Detox-level care from February 23, 2024, through February 27, 2024, authorized February 25, 2024 (a copy of the screen printout is attached as *Exhibit 3*);

b. Two (2) days of Inpatient Rehab-level care from February 28, 2024, through March 1, 2024, confirmed in a written letter from BCBS IL dated February 27, 2024, stating the request "has been approved" and that "[t]he service or procedure requested has been approved as medically necessary," with total days/units approved at that time of seven (7) (a copy of this authorization letter is attached as *Exhibit 4*);

c. Three (3) additional days of care from March 1, 2024, through March 4, 2024, authorized March 1, 2024, and confirmed in a further written BCBS IL letter dated March 1, 2024, again stating the request "has been approved" as "medically necessary," with total days/units approved increased to ten (10) (a copy of this authorization is attached as *Exhibit 5*); and

d. Four (4) days of Residential-level care from March 4, 2024, through March 7, 2024, authorized March 4, 2024, with BCBS IL's own internal notes reflecting authorization for residential care through March 13, 2024 (*see Exhibit 3*).

41. At no point prior to, during, or immediately after Patient H's treatment did BCBS IL advise Plaintiff or Patient H that the authorized treatment would not be reimbursed at a reasonable rate, that reimbursement would be capped based on Patient H being treated by a "Non-Participating Provider," or that any other limitation would apply to defeat payment for the medically necessary, pre-

authorized care Plaintiff provided.

**d. <u>Plaintiff Properly Submitted Claims for Payment</u>**

42. After BCBS IL's representative verified that medical detox treatment was covered and approval was obtained from BCBS IL, Detox LA admitted Patient H and provided medically necessary services. The care provided by Detox LA was consistent with industry best practices and in accordance with the standards established by ASAM.

43. Contemporaneously with Patient H's care, Detox LA properly submitted industry-standard UB-04 forms electronically to BCBS IL for each date of service. Copies of the claim forms are attached as *Exhibit 6.*

44. In all instances, the services were billed accurately using the correct bill type, revenue codes, HCPCS/CPT codes, place of service (POS) codes, and, where applicable, modifiers. Additionally, the claim forms included the provider's name and address, the patient's name, address, sex, and identification number, as well as the dates of service. Each claim form contained all required information in standardized terminology with sufficient detail to enable BCBS IL to review and process the claim in the ordinary course of business. *See Exhibit 6.*

45. On each claim form submitted by Detox LA, Detox LA marked a "Y" in box 53 of the UB-04 claim form. (*See Exhibit 6.*) By marking box 53 of the UB-04 claim forms, Plaintiff indicated that it had obtained a valid assignment of

benefits.[6] This entry affirmed and informed BCBS IL that Detox LA was asserting its claims for payment pursuant to an assignment from Patient H from the outset of the claim billing process. This entry served as a formal notice that Plaintiff was asserting derivative rights under ERISA as Patient H's authorized assignee.

46. In every instance where services were provided and a claim form was submitted, BCBS IL accepted Plaintiff's claims for processing without objection to their format, completeness, or Plaintiff's assignee status. BCBS IL acknowledged that these services were covered, processed the claims, and issued an Explanation of Benefits ("EOB") with partial payment on some claims. By receiving and adjudicating the claims through the claims administration process, BCBS IL acknowledged the validity of the submission and treated Plaintiff as the proper claimant. Defendants' acceptance and processing of the claims without challenge to Plaintiff's status as assignee is consistent with waiver of any purported anti-assignment clause that may exist. Based on this conduct, Plaintiff reasonably understood that BCBS IL would not dispute its standing under ERISA.

---

6 Box 53 on the UB-04 claim form is the designated field used to indicate the provider has obtained a valid Assignment of Benefits and is requesting direct payment of Plan benefits. Industry-standard billing protocols and guidance from the National Uniform Billing Committee recognize this field as the formal method of notifying payers that the provider is asserting derivative rights.

**e. <u>Defendants Underpaid the Claims by More Than 95% Without Adequate Explanation</u>**

47. From February 23, 2024, through March 7, 2024, Patient H received medically necessary, approved inpatient detoxification and residential treatment services at Detox LA's facility in strict compliance with the clinical standards set forth by ASAM. Attached to this Complaint as *Exhibit 7* is a summary chart of the claims, including Detox LA's billed amounts and BCBS IL's allowed, deductible, coinsurance, and paid amounts, along with the explanation codes.

48. For every claim submitted, BCBS IL issued an EOB that stated the billed amount, allowed amount, and paid amount for the services rendered. Despite the medical necessity of the services rendered — services BCBS IL's own utilization management department had authorized in real time — BCBS IL allowed and paid only a small fraction of Plaintiff's billed charges. The billing history for Patient H's course of treatment is as follows:

| **Dates of Service** | **Days** | **Billed Charges** | **Plan Allowed** | **Plan Paid** | **Patient Balance** |
|---|---|---|---|---|---|
| 02/23/2024 | 1 | $5,750.00 | $525.00 | $0.00 | $5,750.00 |
| 02/24/2024 - 02/25/2024 | 2 | $11,500.00 | $1,050.00 | $0.00 | $11,500.00 |
| 02/26/2024 - | 2 | $11,500.00 | $1,050.00 | $573.30 | $10,926.70 |

| | | | | | |
|---|---|---|---|---|---|
| 02/27/2024 | | | | | |
| 02/28/2024 - 02/29/2024 | 2 | $11,500.00 | $1,050.00 | $630.00 | $10,870.00 |
| 03/01/2024 - 03/03/2024 | 3 | $17,250.00 | $1,575.00 | $945.00 | $16,305.00 |
| 03/04/2024 - 03/07/2024 | 4 | $21,800.00 | $2,100.00 | $1,260.00 | $20,540.00 |
| **TOTAL** | **14** | **$79,300.00** | **$7,350.00** | **$3,408.30** | **$75,891.70** |

49. In total, Detox LA billed $79,300.00 for fourteen (14) days of medically necessary, authorized inpatient detoxification and residential treatment. BCBS IL allowed only $7,350.00, an average of $525.00 per day, and paid only $3,408.30. After subtracting the plan paid amount of $3,408.30, the patient's coinsurance responsibility of $2,272.20, and the deductible of $1,669.50 from the total billed charges, the remaining outstanding balance on the claim is $71,950.00 which represents the net damages sought in this action. BCBS IL's total actual payment of $3,408.30 represents less than 4.3% of the total billed charges.

50. The Explanations of Benefits issued in connection with these claims were issued by Anthem Blue Cross under the BlueCard® structure described above, and relied on boilerplate codes, including Code 001 ("This was denied because the

service provided is not covered under the member's benefit plan. . . ."), Code 204 ("THIS SERVICE/EQUIPMENT/DRUG IS NOT COVERED UNDER THE PATIENT'S CURRENT BENEFIT PLAN"), Code 067 ("This amount was applied to the member's coinsurance. . . ."), Code 2 (COINSURANCE AMOUNT), Code 038 ("This amount was applied to the member's deductible. . . ."), and Code 1 (DEDUCTIBLE AMOUNT), none of which identified any specific Plan provision, fee schedule, or methodology supporting the allowed amounts, and none of which is reconcilable with BCBS IL's own contemporaneous, written determination that the underlying services were medically necessary. As alleged above, this conduct by Anthem Blue Cross is legally attributable to BCBS IL as the Home Plan responsible for Patient H's ERISA coverage determinations. Copies of the Explanations of Benefits are attached hereto as *Exhibit 8.*

51. On information and belief, the Plan's own Certificate of Coverage defines the "Maximum Allowance" payable for services rendered by an out-of-network provider as "the lesser of" the provider's billed charges or a Blue Cross and Blue Shield of Illinois non-contracting rate "developed from base Medicare reimbursements" at "approximately 100% of the base Medicare reimbursement rate," and further provides that "[w]hen a Medicare reimbursement rate is not available for a Covered Service," the Maximum Allowance defaults to "100% of the . . . Provider's standard billed charge," and that "[i]f there is no rate according to the

Schedule of Maximum Allowance," the Maximum Allowance defaults to "25% of Billed Charges." This is consistent with the pre-treatment verification of benefits, which itself identified the applicable "Rate Type" as the "Medicare Fee Schedule." To the extent this formula, or one materially identical to it, governs the facility charges at issue here, BCBS IL's payment of $3,408.30 on $79,300.00 in billed charges, which is roughly 4.3% of billed charges, falls below every fallback threshold the Plan's own Certificate of Coverage details, including the absolute limit of 25% of billed charges applicable when no other rate can be ascertained.

**f. <u>Plaintiff's Extensive, Unsuccessful Administrative Efforts to Obtain Payment</u>**

52. On December 9, 2024, Detox LA, acting as Patient H's Authorized Representative and assignee, submitted a First Level Appeal ("December 9, 2024 Appeal") to BCBS IL, demanding, among other things, that BCBS IL respond to the appeal, cease and desist from underpaying Plaintiff's claims, explain the methodology used to arrive at its allowed amounts, remit substantial additional payment consistent with the Plan's reimbursement terms, and produce copies of the governing Plan documents, including the Summary Plan Description, and all other documents and information relevant to the adverse benefit determination. In the December 9, 2024, Appeal, Detox LA specifically indicated that it was pursuing an appeal of the adverse benefit determination and underpayment of

claims based on an assignment. A copy of the December 9, 2024 Appeal is attached hereto as *Exhibit 9*.

53. In its December 9, 2024, Appeal, Detox LA properly identified the patient, including the patient's date of birth, insurance identification number, plan sponsor name, group number, and the claim numbers for each claim. The appeal also included the date of service, billed amount, paid amount, number of days, and plan-allowed amount, as well as the provider's name, NPI, and tax identification number. Detox LA informed BCBS IL that it was pursuing an appeal pursuant to an assignment. The appeal provided a detailed explanation of the basis for its challenge and included Detox LA's demand. *See Exhibit 9*. Despite this, BCBS IL failed to respond to the December 9, 2024 Appeal in its entirety.

54. In its December 9, 2024 Appeal, Detox LA also formally demanded production of all documents and information required under ERISA and applicable state law, including the governing Plan documents and Summary Plan Description; administrative services agreements; internal rules, guidelines, protocols, and criteria relied upon in making the adverse benefit determination; coding and pricing methodologies used to determine reimbursement; identification of all plan administrators, fiduciaries, insurers, and third-party administrators with discretionary authority; telephone recordings and verification of benefits communications; any databases, algorithms, fee schedules, or independent pricing

tools relied upon; and any scientific or clinical judgments supporting the denial. *See Exhibit 9*.

55. Despite being required to render a determination within the time prescribed by 29 C.F.R. § 2560.503-1(i), BCBS IL completely ignored, failed, and refused to respond to Plaintiff's December 9, 2024, Appeal and accompanying document request, maintaining complete administrative silence for nearly five (5) months. During that period, BCBS IL provided no substantive response to the appeal, no determination, no request for additional information, no notice of any extension of time, no explanation whatsoever for its failure to act, and no information regarding any limiting factors, including any purported anti-assignment, statute-of-limitations, or other limiting provisions in the Plan. Defendants' prolonged inaction deprived Plaintiff of the information necessary to meaningfully evaluate and challenge the adverse benefit determination and frustrated Plaintiff's right to a full and fair review of the claims.

56. By failing to respond to the Appeal, Defendants failed to abide by ERISA's mandated timelines for notifying the member and provider about their adverse benefit determination. See 29 C.F.R. § 2560.503-1(i)(2)(iii)(A). BCBS IL was required to provide a response regarding the Plan's adverse benefit determination on review "within a reasonable period of time," but no later than sixty

(60) days after receipt of the appeal.[7] Defendants' failure to timely respond constitutes an independent violation of ERISA's claim-procedure regulations and results in deemed exhaustion pursuant to 29 C.F.R. § 2560.503-1(l).

57. Defendants have violated 29 C.F.R. § 2560.503-1(h)(2)(iii) by failing to provide a full, fair, and timely administrative review. Defendant BCBS IL completely ignored the initial appeal and document request for nearly five months, only to issue a boilerplate rejection much later, on June 10, 2025. Meanwhile, the Defendant Committee failed to ensure its claims agent performed its duties and delayed furnishing the governing Plan documents until May 20, 2025, at which point it merely provided the files, stated that BCBS IL was solely responsible for handling medical benefit determinations, and forwarded the matter back to the silent claim's administrator. The cumulative non-response of BCBS IL, coupled with the Committee's five-month delay in producing the Plan records, constitutes a wholesale

---

[7] "[W]ithin a reasonable period of time" is defined in 29 C.F.R. § 2560.503-1(i)(2)(iii)(A) and distinguishes health plans that grant either one or two appeals. The regulation specifically states:

"In the case of a group health plan that provides for one appeal of an adverse benefit determination, such notification shall be provided not later than 60 days after receipt by the plan of the claimant's request for review of an adverse benefit determination. In the case of a group health plan that provides for two appeals of an adverse determination, such notification shall be provided, with respect to any one of such two appeals, not later than 30 days after receipt by the plan of the claimant's request for review of the adverse determination."

breakdown of the administrative process for which both Defendants are liable. This flagrant procedural stonewalling establishes that further administrative efforts were futile and supports a de novo standard of review under ERISA. *See* 29 U.S.C. § 1024; *Eden Surgical Ctr. v. Budco Grp., Inc.*, No. CV 09-3991 AHM (Ex), 2010 WL 2180360 (C.D. Cal. May 27, 2010).

58. Due to Defendants' unlawful administrative stonewalling and refusal to provide a response to the December 9, 2024, Appeal, Detox LA was forced to retain Leech Tishman Nelson Hardiman, Inc. to break the silence and file a second-level appeal.

59. On May 2, 2025, after nearly five months of complete silence, Plaintiff's counsel sent another letter to BCBS IL ("May 2, 2025, Letter") . This letter addressed Patient H's claim together with four similarly situated members' claims and again demanded a response, cessation of the underpayment practice, an explanation of BCBS IL's reimbursement methodology, and substantial additional payment. The May 2, 2025, Letter was addressed to Blue Cross Blue Shield of Illinois and was sent via email and first-class mail. A copy of the May 2, 2025, Letter is attached hereto as *Exhibit 10*.

60. Receiving no response to the May 2, 2025, Letter either, Detox LA's counsel wrote directly to CC Services, which was acting on behalf of the Committee, the Plan's Administrator, because BCBS IL, as the Plan's delegated claims agent,

was not performing its duties.

61. On May 20, 2025, CC Services' Office of the General Counsel responded, confirming that Plaintiff's counsel's letter "has been forwarded to Blue Cross Blue Shield of Illinois, the Plan's medical benefits insurer," stating that BCBS IL "determines all claims and handles all appeals and requests for medical benefits offered by the Plan," and enclosing copies of the Plan Document, Summary Plan Description, and BCBS IL Certificate of Coverage. A true and correct copy of the May 20, 2025 CC Services letter is attached as *Exhibit 11*.[8] This was the first and only production of the Plan's governing documents in this matter, more than five months after Plaintiff's December 9, 2024 written request for those documents, and it came from the Committee, acting through CC Services, not from BCBS IL, notwithstanding that BCBS IL had, by CC Services' own admission, already received a forwarded copy of Plaintiff's counsel's inquiry and document request.

---

[8] Plaintiff does not separately attach the Plan Document, Summary Plan Description, or BCBS IL Certificate of Coverage enclosed with that letter. As alleged throughout this Complaint, BCBS IL never itself produced any governing Plan document at any point in this matter; the copies Plaintiff possesses were furnished solely by the Committee, acting through CC Services, more than one year after services were provided and more than five months after Plaintiff's original written request. Given that late and singular source, and the risk that any later-amended version of those documents may not reflect the terms actually in effect during Patient H's February through March 2024 course of treatment, Plaintiff relies upon, and quotes directly from, the specific provisions identified throughout this Complaint rather than attaching the documents themselves.

62. On May 21, 2025, Plaintiff's counsel responded to CC Services' Office of the General Counsel, confirming receipt of the enclosed documents and explaining why Plaintiff had written directly to CC Services rather than continuing to await a response from BCBS IL alone: "Detox LA sent a letter to the Plan Administrator because your Claims Administrator, BCBSIL, has not responded to my client's first level appeal request. While we understand that BCBSIL is the Plan's delegated agent for appeals, when that agent is not performing its duties then we have no choice but to look to the principal fiduciary in an effort to avoid legal action." Plaintiff's counsel requested a telephone call with CC Services to discuss the matter further. A copy of this correspondence is attached as *Exhibit 13*.

63. On May 29, 2025, Plaintiff's counsel sent a further demand letter specifically concerning Patient H's claim directly to BCBS IL ("May 29, 2025, Letter"), again demanding a response to the December 9, 2024, Appeal, cessation of the underpayment practice, an explanation of BCBS IL's reimbursement methodology, and substantial additional payment. A copy of the May 29, 2025, Letter is attached as *Exhibit 12.*

64. On June 5, 2025, five days before its June 10, 2025, letter rejecting Plaintiff's appeal as untimely, described below, BCBS IL sent Detox LA a letter acknowledging receipt of "an appeal on your behalf from Detox LA LLC/Dafna Aloni Billing Administrator" concerning claims for Patient H's course of treatment,

but stating that "[i]n order for this appeal to be reviewed, it must to be [*sic*] submitted to your local, Anthem BlueCross of California." A true and correct copy of that letter is attached hereto as *Exhibit 14*. That letter was internally inconsistent on its face: its header referenced a single claim, while the body of the same letter identified five separate claims. Having originally been directed by Anthem Blue Cross to pursue its appeal with BCBS IL, Plaintiff was now directed by BCBS IL to pursue the same appeal with Anthem Blue Cross, a closed loop between the Host Plan and Home Plan described in Section IV above that made it impossible for Plaintiff to obtain a substantive review from either entity. Only days after issuing this redirection, BCBS IL nonetheless treated an appeal as having been properly "received" by BCBS IL itself on June 9, 2025, and rejected it as untimely, as alleged below, even though BCBS IL's own June 5, 2025, letter had told Plaintiff to direct that same appeal elsewhere.

65. On June 10, 2025, BCBS IL responded for the first time, asserting that Plaintiff's appeal. BCBS IL characterized this appeal as having been "received" on June 9, 2025, and determined that it was untimely because, according to BCBS IL, the "initial denial date was on or before April 10, 2025," and "[t]he appeal time frame has ended." A copy of the June 10, 2025, BCBS IL letter is attached hereto as *Exhibit 15*. The "initial decision date" of April 10, 2025, stated in that letter is wrong: Patient H's services were rendered February 23 through March 7, 2024, and BCBS

IL's own remittance advices establish that its actual claim determinations and payments on this claim were issued in 2024, with check/EFT dates of March 29, 2024, April 12, 2024, and April 19, 2024. No determination on this claim occurred on or around April 10, 2025. That same letter identified the disputed "Claim Amount" as $75,891.70, which is the exact outstanding balance reflected in Plaintiff's own billing records.

66. Whatever the correct triggering date, BCBS IL is in no position to fault Plaintiff for any delay. BCBS IL's own June 10, 2025, letter states: "An appeal must be sent to us within 180 days of the date of the denial letter (with time allowed for mail delivery). If it's not received within that time frame, your right to a review ends." By that same standard, BCBS IL itself took 183 days, more than six months, and longer than the very 180-day period it invokes against Plaintiff, to issue any decision on Plaintiff's December 9, 2024, First Level Appeal, and did not communicate that the matter was concluded until its September 9 and September 15, 2025, letters, 274 and 280 days, respectively, after that appeal was filed. This far exceeds not only the 180-day window BCBS IL says ends a claimant's right to review, but also the shorter decision timeframes ERISA's claims-procedure regulations impose on plan administrators and insurers deciding an appeal. A claims administrator that itself takes the better part of a year to respond to an appeal, and that tells claimants that missing its own 180-day window causes their "right to a

review" to "end," cannot credibly invoke that same deadline against the claimant who filed it.

67. On July 7, 2025, Plaintiff's counsel wrote to CC Services: "We have patiently awaited a response from BCBSIL and have not received one, despite attempting to follow up. I'm therefore circling back with you." The next morning, July 8, 2025, CC Services' Office of the General Counsel responded, forwarding "a copy of the correspondence sent from BCBS of Illinois to Detox LA, LLC on or about June 5, 2025 regarding the appeal," and stating, "Please address any further questions regarding such response with BCBS of Illinois" — once again redirecting Plaintiff to the very Claims Administrator whose non-response had prompted Plaintiff's inquiry to CC Services in the first place. On July 21, 2025, Plaintiff's counsel advised CC Services in writing: "I checked with my client and they stated that they originally tried appealing to Anthem Blue Cross and then were directed to BCBSIL. As you can see from BCBSIL's letter, they are trying to avoid dealing with the issue and therefore it is pointless for us to be directed to them with further questions, as you requested. Given the refusal on the part of both the claims administrator and plan administrator/sponsor to resolve my client's appeal . . ., we believe all administrative remedies have been exhausted and/or would be deemed futile. Provider has no choice but to now proceed to litigation." (*See Exhibit 13.*)

68. Notwithstanding that statement, BCBS IL issued two further letters,

one dated September 9, 2025, and the second one dated September 15, 2025. True and correct copies of these two letters, of which are attached hereto as *Exhibits 16 and 17*, respectively, each state that BCBS IL's "prior response dated June 10, 2025, completed the internal appeal process that is available" to Plaintiff. Remarkably, these two letters, addressing the same course of treatment, identified two different "Initial Decision" dates (April 10, 2024, rather than the April 10, 2025, date given in the June 10, 2025 letter) and two different, and different again from the June 10, 2025 letter's, "Claim Amount[s]" of $71,950.00 in the September 9, 2025, letter, and $65,336.70 in the September 15, 2025, letter.

69. Across four separate written responses spanning more than three months, BCBS IL was unable to consistently state either the date of its own decision or the dollar amount in dispute for the identical course of treatment, for the identical patient, involving the identical treating physician and facility.

## VI. DEFENDANTS VIOLATED ERISA'S CLAIMS-PROCEDURE REQUIREMENTS BY ISSUING SEVERELY DEFICIENT EXPLANATIONS OF BENEFITS AND FAILING TO REIMBURSE PLAINTIFF IN ACCORDANCE WITH THE PLAN'S OWN REIMBURSEMENT METHODOLOGY

70. Plaintiff submitted claims for reimbursement to BCBS IL for the services rendered. For every claim submitted, BCBS IL issued an EOB that provided

an "Allowed Amount" totaling less than 10% of the billed charges. Plaintiff is informed and believes that the allowed amounts were not calculated in accordance with the reimbursement obligations imposed by the Plan and were inconsistent with Defendants' representations.

71. BCBS IL violated 29 C.F.R. § 2560.503-1 by issuing materially deficient EOBs that failed to provide a clear, consistent, or understandable explanation of the bases for the adverse benefit determinations. The EOBs issued by BCBS IL were materially deficient and relied upon generic adjustment and denial codes that provided only conclusory statements without sufficient factual or contractual support. *See Exhibit 8.*

72. For multiple claims, BCBS IL assigned denial Code 001, stating "we denied this service. Your benefits don't cover this kind of care," and denial Code 204, stating "this service/equipment/drug is not covered under the patient's current benefit plan." Yet for other claims within the very same course of treatment, BCBS IL simultaneously approved and issued partial payment while applying deductible (Code 038) and coinsurance (Code 067) adjustments to those same categories of charges.

73. By simultaneously asserting that services were "not covered" on some claims while paying benefits, subject to deductible and coinsurance, on others arising from the same fourteen-day course of treatment, BCBS IL created

irreconcilable ambiguity regarding the actual basis for its determinations. The EOBs failed to identify whether BCBS IL was denying specific services, procedure codes, line items, or portions of the billed charges, and failed to explain which services were covered, which were not, and what Plan provision governed each determination.

74. As a result of this conflicting and incomplete information, Plaintiff could not determine whether BCBS IL's adverse determinations were based upon coverage exclusions, deductible obligations, coinsurance obligations, fee-schedule reductions, maximum allowable charge limitations, network status considerations, or some combination thereof. The EOBs therefore failed to provide Plaintiff with a meaningful explanation of the adverse benefit determinations or a fair opportunity to evaluate and challenge those determinations through the administrative appeal process. *See Exhibit 8.*

75. The regulation at 29 C.F.R. § 2560.503-1(g)(1) mandates that a notification of adverse benefit determination set forth, in a manner calculated to be understood by the claimant: (i) the specific reason or reasons for the adverse determination; (ii) reference to the specific plan provisions on which the determination is based; (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; (iv) a description of the plan's review procedures and the time limits applicable to such procedures, including a statement

of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review; and (v) if an internal rule, guideline, protocol, or other similar criterion was relied upon, either the specific rule or a statement that such a rule was relied upon and that a copy will be provided free of charge upon request.

76. BCBS IL violated 29 C.F.R. § 2560.503-1(g)(1)(i) by merely listing numerical codes, which included 001, 204, 067, and 038, accompanied by vague, generic descriptions that failed to explain the actual basis for the reductions and denials. BCBS IL further failed to disclose the methodology used to calculate the allowed amounts, identify the reimbursement formula utilized, or explain why Plaintiff's billed charges were reduced by more than 90%. *See Exhibit 8.*

77. BCBS IL violated 29 C.F.R. § 2560.503-1(g)(1)(ii) by failing to identify any specific Plan provision, Summary Plan Description provision, reimbursement formula, fee schedule, pricing methodology, exclusion, limitation, or other governing authority relied upon in making the determinations. This omission prevented Plaintiff from understanding the basis for the reductions and deprived Plaintiff of the ability to evaluate or challenge the legitimacy of BCBS IL's benefit determinations. *See Exhibit 8.*

78. BCBS IL violated 29 C.F.R. § 2560.503-1(g)(1)(iii) by failing to identify any deficiency in Plaintiff's submissions, request additional documentation,

or explain what information, if any, was required to further evaluate the claims. These omissions denied Plaintiff a fair opportunity to supplement the record or cure any perceived defect. *See Exhibit 8.*

79. BCBS IL violated 29 C.F.R. § 2560.503-1(g)(1)(v)(A) by failing to disclose any specific rule, guideline, protocol, or other similar criterion relied upon in making the adverse determinations, and by failing to include a statement that such a rule was relied upon or that a copy would be provided free of charge upon request. *See Exhibit 8.*

80. BCBS IL violated 29 C.F.R. § 2560.503-1(g)(1)(iv) by omitting from its EOBs any description of the Plan's review procedures and applicable time limits, including any statement of Plaintiff's right to bring a civil action under ERISA § 502(a) following an adverse benefit determination on review. These omissions deprived Plaintiff of critical information necessary to evaluate and pursue available remedies, compounding BCBS IL's other procedural violations and undermining ERISA's requirement of a full and fair review. *See Exhibit 8.*

81. The inadequacy of BCBS IL's original 2024 EOBs is further demonstrated by BCBS IL's own subsequent correspondence, which advanced an entirely different rationale for the underpayment than anything disclosed in the original EOBs. The 2024 EOBs relied exclusively on Codes 001, 204, 067, and 038, which asserted, that services were "not covered," subject to deductible, or subject to

coinsurance. None of the 2024 EOBs identified Patient H as having received services from a "Non-Participating Provider," referenced any "priced amount" for the services at issue, or cited Decision Code "T43." It was not until BCBS IL's June 10, September 9, and September 15, 2025, letters, which was more than a year after the claims were first adjudicated. that BCBS IL first asserted Decision Code T43 and the rationale that "[c]harge exceeds the priced amount for this service. Services provided by a Non-Participating Provider. Patient is responsible for charges over the priced amount." This newly asserted rationale is irreconcilable with the original EOBs' reliance on Codes 001 and 204, which characterized the services as simply "not covered," and cannot be reconciled with the deductible and coinsurance adjustments reflected in Codes 038 and 067 on other claims from the same course of treatment. An administrator may not hold a known or reasonably knowable reason for denying a claim in reserve and assert it for the first time more than a year later. Had the original EOBs adequately explained the basis for BCBS IL's determinations, this rationale, and the "Initial Decision Date" and "Claim Amount" information purportedly associated with it, would have been disclosed contemporaneously with the 2024 claim adjudications and not withheld for more than a year and then disclosed in a form that was itself mutually inconsistent across the three 2025 letters.

82. The regulation established under 29 C.F.R. § 2560.503-1(b)(5) requires that "claims procedures contain administrative processes and safeguards

designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." Plaintiff is informed and believes that BCBS IL failed to implement any such administrative processes and safeguards, as reflected in BCBS IL's inability to consistently state, across four separate written responses, either the date of its own decision or the dollar amount in dispute for the identical course of treatment.

**a. <u>Defendants Failed to Reimburse the Claims in Accordance with the Plan's Own Reimbursement Methodology</u>**

83. Patient H received inpatient detoxification and residential care services from Detox LA. The services provided by Detox LA to Patient H were 24-hour inpatient facility services that were correctly coded and billed using revenue codes, HCPCS/CPT codes, place of service (POS) codes, and, where necessary, modifiers on standard industry UB-04 claim forms. The two HCPCS/CPT codes utilized for the facility services were H0010 and H0018.

84. H0010 is a HCPCS Level II code that stands for "alcohol and/or drug services; sub-acute detoxification (residential addiction program inpatient)." This code is utilized to bill for medically supervised detoxification services provided in a residential setting for individuals with substance use disorders. This code represents a critical phase where patients receive 24-hour supervision and support as they safely

withdraw from substances. Services under H0010 include psychiatric evaluation, continuous nursing supervision, ongoing medical and withdrawal monitoring, and daily physician or nurse practitioner rounds. Patients receive medication management and tapering protocols multiple times per day, Clinical Institute Withdrawal Assessment (CIWA) and Clinical Opiate Withdrawal Scale (COWS) assessments, vital sign checks every two to four hours, and daily clinical and psychosocial assessments with corresponding progress notes. Therapeutic services include daily psychoeducation and group counseling, individual counseling at least weekly, and regular case management and discharge planning. Additional support includes toxicology screenings as needed, structured nutrition and meal monitoring, and family engagement through calls or sessions one to two times per week.

85. H0018 is the HCPCS code for short-term residential treatment in a non-hospital residential program. It is billed on a per diem basis, meaning the provider bills one unit for each day of service. This level of care delivers a structured setting with 24-hour supervision, supported by both clinical services and medical oversight. Services include a psychosocial assessment and development of an individualized treatment plan, along with three to five daily therapeutic groups such as cognitive behavioral therapy ("CBT"), dialectical behavior therapy ("DBT"), and relapse-prevention programming. Patients receive individual therapy one to two times per week, case management several times per week, and ongoing family communication

or therapy. Daily psychoeducation, life-skills training, experiential therapies, and community-based living support are also provided, along with drug testing as needed and regular meal services. Treatment includes the development of a comprehensive discharge plan and a relapse-prevention plan.

86. Plaintiff is informed and believes that no Medicare reimbursement rate exists for the inpatient detoxification and residential treatment facility services billed under HCPCS codes H0010 and H0018. Accordingly, any reimbursement methodology purportedly based upon a Medicare rate is inapplicable to the services at issue.

87. As alleged in Paragraph 50 above, the Plan's own Certificate of Coverage defines the Maximum Allowance payable for out-of-network services as a three-tier methodology: (i) the lesser of the Provider's billed charges or approximately 100% of the applicable base Medicare reimbursement rate; (ii) if no Medicare reimbursement rate is available for the Covered Service, 100% of the Provider's standard billed charge; and (iii) only if there is no rate at all according to the Plan's Schedule of Maximum Allowance, 25% of billed charges. Because no Medicare reimbursement rate exists for services billed under H0010 or H0018, subsection (i) of the Plan's reimbursement methodology cannot apply, and the Plan's own terms default to subsection (ii): 100% of Plaintiff's billed charges.

88. BCBS IL never identified any applicable Medicare reimbursement rate

for the services at issue, never disclosed any calculation or methodology showing why subsection (ii)'s 100%-of-billed-charges default should not apply, and never explained any basis for resorting to subsection (iii)'s 25% floor, let alone for paying an amount below even that floor. Plaintiff is informed and believes that, under the Plan's own express terms, BCBS IL was obligated to reimburse Plaintiff's claims at 100% of billed charges pursuant to subsection (ii), and that BCBS IL's payment of $3,408.30 on $79,300.00 in billed charges, which represented only 4.3% of the billed charges, reflects a fundamental and unexplained departure from the Plan's own reimbursement methodology, not a good-faith application of it.

89. Even taken on its own terms, the "priced amount" rationale BCBS IL first asserted in 2025 does not satisfy ERISA's claims-procedure regulations. Neither the June 10, 2025, letter, the September 9, 2025, letter, nor the September 15, 2025, letter defines what a "priced amount" is, states the dollar figure or percentage that constitutes the "priced amount" for Patient H's claims, identifies any formula, fee schedule, or benchmark used to calculate it, or cites any specific Plan or Certificate of Coverage provision establishing a "priced amount" methodology at all. Decision Code T43 and the phrase "priced amount" appear nowhere in the Plan documents Plaintiff has reviewed. As alleged above, the only reimbursement methodology the Plan's own Certificate of Coverage actually specifies for out-of-network services is the three-tier Maximum Allowance methodology, and BCBS IL

never identified which, if any, tier of that methodology its "priced amount" was meant to invoke or reconciled the "priced amount" with the $525.00 average daily allowance actually applied. Further, this figure that corresponds to none of the Plan's three tiers. A denial rationale that cannot be traced to any provision of the governing Plan, and that uses an undefined term found nowhere in that Plan, does not satisfy 29 C.F.R. § 2560.503-1(g)(1)(i)'s requirement of "the specific reason or reasons for the adverse determination" or § 2560.503-1(g)(1)(ii)'s requirement of "reference to the specific plan provisions on which the determination is based." "Priced amount" is not a reason; it is a label for a number BCBS IL has never explained.

90. The EOBs issued by BCBS IL were materially deficient because they failed to disclose any pricing formula, reimbursement methodology, Medicare benchmark, Maximum Allowance calculation, fee schedule, or other objective basis for the Allowed Amounts, and failed to identify any relevant Plan provision, reimbursement provision, exclusion, or limitation supporting the reductions, or any connection between the Allowed Amounts and the reimbursement methodology actually set forth in the Plan.

91. On information and belief, the Plan's own document independently required BCBS IL's EOBs and appeals responses to include "a statement describing denial codes with their meanings and the standards used," and to disclose "[a]ny

internal rule, guideline, protocol or other similar criterion relied on in the determination," or a statement that a copy would be provided free of charge on request. BCBS IL's EOBs and appeal responses did neither. They listed only numerical codes accompanied by brief, generic boilerplate language that merely restated the category of denial without ever identifying the actual standard used to reach it. The boilerplate language does not constitute "the standards used" within the meaning of the Plan's own requirement. BCBS IL never disclosed any internal rules, guidelines, protocols, methodology, or criteria, nor any statement that one would be provided upon request. These are independent violations of the Plan's own claims-notice requirements, separate from and in addition to BCBS IL's violations of 29 C.F.R. § 2560.503-1(g)(1) as alleged in this Complaint.

92. Furthermore, on information and belief, the Plan's own document independently required BCBS IL to disclose "the right to request, free of charge, reasonable access to and copies of all documents, records and other information relevant to the Claim for benefits." BCBS IL's EOBs and appeal responses never disclosed this right. Nor did BCBS IL's appeal response dated June 10, 2025, include any of the forms the Plan requires to accompany a final appeal determination — a Request for External Review Form, an Authorized Representative Form, or Health Care Provider Certification form, even though BCBS IL treated that letter as its final word on Plaintiff's appeal. Separately, the Plan's own Certificate warns members

that non-participating provider reimbursement is based on "your Policy's fee schedule, usual and customary charge . . . or other methods as defined by the Policy." BCBS IL never identified which, if any, of these methods, or the Maximum Allowance formula described in this Complaint, it used to arrive at the "priced amount" underlying its determination.

93. BCBS IL's repeated and compounding violations of 29 C.F.R. § 2560.503-1 deprived Plaintiff of a full and fair review and prevented Plaintiff from meaningfully understanding, evaluating, or appealing the adverse benefit determinations at the time they were issued. These violations independently support the deemed-exhaustion allegations and support Plaintiff's claim for improper denial of benefits under 29 U.S.C. § 1132(a)(1)(B), as they deprived Plaintiff of a meaningful opportunity to challenge the denials and rendered BCBS IL's determinations fundamentally unreliable.

## VII. PLAINTIFF HAS EXHAUSTED ITS ADMINISTRATIVE REMEDIES, OR, IN THE ALTERNATIVE, ANY FURTHER EXHAUSTION WOULD BE FUTILE AND IS EXCUSED

94. On information and belief, the Plan confirms that "there is one level of internal appeal available" under the Plan, and that any appeal "will be conducted by individuals . . . who were not involved in making the initial denial," and that "[n]o deference will be given to the initial Adverse Benefit Determination." The Plan

further confirms that a claimant need not always exhaust the appeals process before suing: exhaustion is required except "in situations where you are not required to exhaust the appeals process." BCBS IL's appeal response letter satisfies none of these requirements: it reflects no fresh, no-deference review by personnel uninvolved in the original denial, and, as alleged throughout this Complaint, BCBS IL's own conduct rendered any further exhaustion futile in any event.

95. BCBS IL has confirmed, in its own words, that no further internal review is available to Plaintiff. BCBS IL's June 10, 2025, letter states that if an appeal "is not received within that time frame, your right to a review ends," and BCBS IL's September 9, 2025, and September 15, 2025, letters both inform Plaintiff for the first time that BCBS IL's "prior response dated June 10, 2025, completed the internal appeal process that is available to you." Plaintiff has therefore actually and formally exhausted its administrative remedies under the Plan.

96. BCBS IL's later characterization, in its September 2025 letters, of its June 10, 2025, letter as having "completed the internal appeal process" is itself telling: that letter never reached the merits of Plaintiff's claim. It rejected Plaintiff's appeal solely on the ground that "[t]he appeal time frame has ended," a ground that, as alleged above, does not withstand scrutiny of BCBS IL's own stated 180-day rule or its own unreliable "initial decision date." BCBS IL has thus never issued a reasoned, merits-based determination of Plaintiff's claim to which any deference

would be due. Combined with the procedural irregularities alleged throughout this Complaint, any benefit determination by BCBS IL in this matter is entitled to little or no deference and should be reviewed de novo. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 972-75 (9th Cir. 2006) (en banc) (procedural irregularities in the claims process may result in de novo, rather than deferential, review of a benefit determination).

97. On information and belief, the Plan's Summary Plan Description states, with respect to medical benefits, that "[a]s the Claims Administrator for this benefit, [BCBS IL] has discretionary authority to determine the matters within its jurisdiction, and the decisions of the Claims Administrator shall be final, binding and conclusive." Even crediting that provision, the deferential review it might otherwise invite is displaced here by BCBS IL's own conduct. A grant of discretionary authority does not immunize a fiduciary that fails to exercise that discretion through a reasoned decision-making process; where, as here, procedural irregularities pervade the claims process, courts apply less deference, or none, regardless of any discretionary-authority clause. *See Abatie*, 458 F.3d at 971 (a plan administrator's conflict of interest and procedural irregularities are weighed in deciding how much deference to accord a discretionary decision and may reduce that deference to a vanishing point).

98. Plaintiff has exhausted the administrative remedies available under the

Plan. BCBS IL's June 10, 2025, letter (Exhibit 15) constituted its final determination on Plaintiff's appeal. As alleged in paragraph 94, that letter stated Plaintiff's "right to a review ends." BCBS Il confirmed this in its September 9, 2025, letter, which stated that the June 10, 2025 response "completed the internal appeal process that is available to you" and described it as "or final decision letter." No further internal appeal is available to Plaintiff under the Plan, and Plaintiff may now bring this action under ERISA §502(a)

99. Defendant BCBS IL's explicit written confirmation across its September 2025 letters stating that its prior response dated June 10, 2025 "completed the internal appeal process that is available" to Plaintiff constitutes a binding administrative admission that no further internal review remained available under the Plan. This admission binds the Defendant Committee as well; the Committee, acting through CC Services' Office of the General Counsel on May 20, 2025, explicitly represented in writing that BCBS IL "determines all claims and handles all appeals and requests for medical benefits offered by the Plan," and directly forwarded Plaintiff's inquiries to BCBS IL for a final determination. Because the Committee contractually delegated this exclusive authority to BCBS IL and expressly directed Plaintiff to look to BCBS IL for all appeal closures, the written representations of BCBS IL are legally binding upon the Plan and the Committee as a whole. Having thus repeatedly represented, both directly and through their

designated claims agent, that Plaintiff's internal appeal rights were completely exhausted, Defendants are collectively estopped from now arguing, or from later arguing, that Plaintiff failed to exhaust administrative remedies under the Plan.

100. Plaintiff's own contemporaneous, pre-suit assessment independently corroborates exhaustion and futility. On July 21, 2025, before this action was filed, Plaintiff's counsel advised CC Services in writing: "I checked with my client and they stated that they originally tried appealing to Anthem Blue Cross and then were directed to BCBSIL. As you can see from BCBSIL's letter, they are trying to avoid dealing with the issue and therefore it is pointless for us to be directed to them with further questions, as you requested. Given the refusal on the part of both the claims administrator and plan administrator/sponsor to resolve my client's appeal . . ., we believe all administrative remedies have been exhausted and/or would be deemed futile. Provider has no choice but to now proceed to litigation." This was not a decision to abandon the administrative process prematurely; it was a reasoned, documented conclusion, reached only after more than seven months of unanswered appeals, redirected inquiries, and unexplained silence from both BCBS IL and CC Services, and communicated to CC Services before suit was filed rather than asserted for the first time in this Complaint.

101. ERISA requires every plan to establish claims procedures and imposes specific procedural requirements that must be followed. 29 U.S.C. § 1133. A plan

must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant," 29 U.S.C. § 1133(1), and must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). The Department of Labor's implementing regulations under 29 C.F.R. § 2560.503-1(h) impose specific procedural protections to ensure that right is honored. As alleged throughout this Complaint, BCBS IL failed to comply with those protections.

102. The Ninth Circuit has recognized that ERISA itself requires an administrator who denies a claim to explain the "specific reasons for such denial" and provide a "full and fair review" of that denial, requirements underscored by regulations requiring that a claimant be given information about the denial, including "the specific plan provisions" on which it is based and "any additional material or information necessary for the claimant to perfect the claim." *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 719 (9th Cir. 2012) (quoting 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(g)). Courts have accordingly held that a denial notice failing to adequately set forth the reasons for denial, the plan's review procedures, and the claimant's appeal rights precludes a plan administrator from asserting a failure-to-exhaust defense. *Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan*, 497

F.3d 234, 246 (2d Cir. 2007); *Cromer-Tyler v. Teitel*, 294 F. App'x 504, 508 (11th Cir. 2008) (exhaustion excused where a termination letter did not contain a specific reason for the determination, did not refer to specific plan provisions, and did not describe the procedures necessary to review the claim). "[W]hen an employee benefits plan fails to establish or to follow 'reasonable claims procedures' consistent with the requirements of ERISA, a claimant need not exhaust because his claims will be deemed exhausted." *Barboza v. Cal. Ass'n of Pro. Firefighters*, 651 F.3d 1073, 1076 (9th Cir. 2011).

103. In the alternative, under ERISA, every employee benefit plan must establish and maintain reasonable claims procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations, and claims procedures will be deemed "reasonable" only upon complete compliance with 29 C.F.R. § 2560.503-1(b).

104. The regulation at 29 C.F.R. § 2560.503-1(l)(1) instructs that if a plan fails to consistently adhere to the requirements of that regulation, "a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim."

105. BCBS IL failed to process Plaintiff's claims in a manner consistent with,

or substantially in compliance with, 29 C.F.R. § 2560.503-1. Among other things, BCBS IL: failed to set out the specific reasons for the underpayment of Plaintiff's claims in the EOBs issued during the review process, including failing to disclose any purported anti-assignment clause, contractual limitations period, or other limiting provision as a basis for the underpayment; failed to reference the specific Plan provisions on which its underpayment determinations were based, including any purported anti-assignment clause, limitations period, or other limiting provision; failed to describe any additional material or information needed to perfect the claims, or to explain why any such information was necessary; failed to timely provide the Plan Document, Summary Plan Description, or other governing Plan materials upon which its determinations were purportedly based; failed to state its determinations in a manner calculated to be understood by Plaintiff, including by waiting more than a year to disclose the rationale underlying its determinations and then disclosing that rationale in an internally inconsistent form; and failed to describe the Plan's review procedures and applicable time limits, including Plaintiff's right to bring a civil action under ERISA § 502(a) following an adverse benefit determination on review. BCBS IL further violated 29 C.F.R. § 2560.503-1(i)(2)(iii)(A), which requires that, for a post-service claim, the plan administrator notify the claimant of the plan's benefit determination on review within a reasonable period of time, but no later than sixty (60) days after receipt of the claimant's request for review, which is a deadline

BCBS IL missed by more than four months, having taken 183 days to provide a decision to Plaintiff's December 9, 2024, Appeal. The Plan's own Certificate of Coverage imposes even shorter, more specific deadlines: BCBS IL was required to notify the party filing an appeal "within three business days" of any information needed to review it, and to render a written decision "within 15 business days after [BCBS IL] receive[s] any needed information, but no later than 30 calendar days upon receipt of the request," or, for an appeal filed after services were already received, "within 60 calendar days." BCBS IL missed these Plan-specific deadlines by the same margin. BCBS IL also violated 29 C.F.R. § 2560.503-1(j)(1) and (2), which require that a Plan's benefit determination on review be communicated in a manner calculated to be understood by the claimant and set forth both the specific reasons for the determination and the specific reasons for the determination and the Plan provision on which it is based. These requirements are distinct from, and were independently violated in addition to, BCBS IL's failure to comply with the initial benefit determination requirements of subsection (g) that is described above.

106. BCBS IL's repeated and compounding procedural violations deprived Plaintiff of a full and fair review and prevented Plaintiff from meaningfully understanding, evaluating, or appealing the adverse benefit determinations. Accordingly, and independent of Plaintiff's actual exhaustion alleged above, Plaintiff is deemed to have exhausted all administrative remedies available under the

Plan pursuant to 29 C.F.R. § 2560.503-1(l) and is entitled to pursue all remedies available under ERISA § 502(a).

107. BCBS IL cannot claim ignorance of Plaintiff's document requests or appeal correspondence. BCBS IL received Plaintiff's December 9, 2024, Appeal and document request directly, and as alleged above, independently received a forwarded copy of Plaintiff's counsel's May 2025 inquiry and renewed document request from CC Services. BCBS IL had actual notice of Plaintiff's requests through at least two independent channels, and its failure to respond to either cannot be excused on the basis that the requests were misdirected or unreceived.

108. Independent of Plaintiff's actual and deemed exhaustion alleged above, Defendants have waived, and are estopped from asserting, any defense premised on Plaintiff's alleged failure to exhaust administrative remedies. Defendants' own procedural violations, such as their failure to issue compliant EOBs, their failure to produce Plan documents despite direct and repeated written requests, their failure to consistently identify the basis for their determinations, and their own multi-month delays in responding to Plaintiff's appeal, all rendered the administrative process fundamentally defective and foreclosed any meaningful opportunity for Plaintiff to exhaust remedies that Defendants themselves failed to make available. A plan administrator or insurer whose own conduct renders exhaustion impossible or futile may not then invoke a claimant's failure to exhaust as a defense.

## VIII. ANY PURPORTED ANTI-ASSIGNMENT CLAUSE DOES NOT BAR PLAINTIFF'S CLAIM AND DEFENDANTS HAVE WAIVED, AND ARE EQUITABLY ESTOPPED FROM ASSERTING, ANY SUCH PROVISION

109. On information and belief, the BCBS IL Certificate of Coverage issued in connection with the Plan contains a provision, captioned "Payment of Claims and Assignment of Benefits," stating in relevant part that, "[e]xcept for the assignment of benefit payment described above," a covered person's "Claim for benefits under this Certificate[] is expressly non-assignable and non-transferable in whole, or in part, to any person or entity, including, any Provider," and that "[a]ny such assignment or transfer of a Claim for benefits or coverage shall be null and void."

110. While anti-assignment clauses in ERISA health plans are generally recognized in this Circuit, an administrator or insurer completely waives the right to enforce an anti-assignment provision if it fails to raise it during the administrative process. *See Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Ill.*, 983 F.3d 435, 440 (9th Cir. 2020); *see also Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1296-97 (9th Cir. 2014).

111. To adequately allege waiver, Plaintiff need only allege that BCBS IL "was aware or should have been aware, during the administrative [claim] process that [Plaintiff] was acting as its patient['s] assignee." *Beverly Oaks*, 983 F.3d at 440

(quoting *Spinedex*, 770 F.3d at 1297). "[A]n administrator may not hold in reserve a known or reasonably knowable reason for denying a claim and give that reason for the first time when the claimant challenges a benefits denial in court." *Id.* at 441 (quoting *Spinedex*, 770 F.3d at 1296); *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 719 (9th Cir. 2012).

112. When a healthcare provider sues an insurer pursuant to a valid assignment, the provider "stands in the shoes of the beneficiary." *Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Grp., Inc.*, 187 F.3d 1045, 1051 (9th Cir. 1999). Assignments are broadly construed; no magic words are required, and intent governs. *DB Healthcare, LLC v. Blue Cross Blue Shield of Ariz., Inc.*, 852 F.3d 868, 876 (9th Cir. 2017). "Waiver is often described as the intentional relinquishment of a known right." *Gordon v. Deloitte & Touche, LLP Grp. Long Term Disability Plan,* 749 F.3d 746, 752 (9th Cir. 2014). When an insurer communicates a denial of a claim, it must state a reason for the denial, and it will not be permitted to later rely on alternate reasons not presented in the denial letter, "unless the plan beneficiary has waived any objection to the reason being advanced for the first time during the judicial proceeding." *Harlick,* 686 F.3d at 719. Plaintiff has not waived, and does not waive, any such objection here.

113. Because Defendants failed to provide a timely or unified response to Plaintiff's written document requests beginning December 9, 2024, Defendants

cannot satisfy their evidentiary burden of establishing that an enforceable anti-assignment restriction was properly or timely asserted. Defendants bear the burden of establishing the existence and enforceability of any anti-assignment provision upon which they seek to rely. While the Defendant Committee eventually produced a copy of the governing Plan documents late on May 20, 2025, after a five-month delay, Defendant BCBS IL failed to produce the governing documents at any point in this matter, completely ignoring its independent statutory disclosure obligations. Critically, despite the Committee's late production, and across four separate subsequent written responses issued by BCBS IL between June and September 2025, neither Defendant ever once cited, raised, or relied upon an anti-assignment provision to challenge Plaintiff's standing. Because BCBS IL never produced the records, the Committee provided them late, and both Defendants completely failed to assert the restriction prior to litigation, any such provision is waived and completely unenforceable as a matter of law.

114. Defendants' joint failure to provide a timely, cooperative response to Plaintiff's December 9, 2024, Appeal and document request directly violates 29 C.F.R. § 2560.503-1(h)(2)(iii). BCBS IL maintained absolute administrative silence for nearly five months, while the Committee withheld the governing Plan documents for 132 days past the statutory deadline. By keeping the Plan documents suppressed throughout the core administrative window, Defendants failed to assert or notify

Plaintiff of any purported anti-assignment restriction when the claims were actively being contested. Under settled Circuit authority, a plan administrator or insurer cannot completely withhold the governing plan instruments, ignore a claimant's formal appeals, and then belatedly leverage a hidden anti-assignment clause as a litigation defense after the administrative route has closed. *See* 29 U.S.C. § 1024; *Eden Surgical Ctr. v. Budco Grp., Inc.,* No. CV 09-3991 AHM (Ex), 2010 WL 2180360 (C.D. Cal. May 27, 2010).

115. As alleged above, Detox LA designated its assignee status on every claim form submitted, and BCBS IL, through Anthem Blue Cross as its Host Plan, accepted, processed, and adjudicated those claims such as issuing EOBs and partial payment, without ever, during the initial adjudication, raising the anti-assignment provision as a basis for denying or reducing payment. Indeed, BCBS IL's own pre-admission verification of benefits, conducted February 20, 2024, affirmatively confirmed that benefits under the Plan were assignable, with no restriction disclosed. At no point during the December 9, 2024 Appeal, the ensuing administrative correspondence, or any of the four written responses BCBS IL issued between June and September 2025, did BCBS IL, or CC Services on the Plan's behalf, invoke the anti-assignment provision as a ground for denying Plaintiff's claim.

116. Defendants' acceptance and processing of Plaintiff's claims without challenge to Plaintiff's assignee status, followed by Defendants' complete failure

ever to invoke the anti-assignment provision during more than a year of administrative proceedings, is consistent with waiver of that provision and, independently, supports equitable estoppel. Defendants knew the relevant facts; intended, or acted such that Plaintiff had a right to believe, that their conduct would not be followed by a later assertion of the anti-assignment provision; Plaintiff was ignorant of any dispute as to its assignee status; and Plaintiff relied on Defendants' conduct to its detriment by continuing to pursue administrative remedies for more than a year, rather than pursuing alternative avenues of recovery. *Gabriel v. Alaska Elec. Pension Fund,* 773 F.3d 945, 955, 957 (9th Cir. 2014).

117. On information and belief, the Plan confirms that it routinely contemplates and works with valid assignees, further undercutting any claim that BCBS IL was unaware of, or entitled to disregard, Plaintiff's assignee status. The Plan's warning regarding non-participating providers expressly cross-references its "Payment of Claims and Assignment of Benefits" provision as the governing authority "[f]or information regarding assigning benefits." And the Plan's own claims-timing provision extends the right to statutory interest on a late-paid claim to "you or the valid assignee," confirming that the Plan's own text recognizes and provides for assignees as a matter of course, not as an exception requiring special disclosure or objection.

118. Further, BCBS IL itself never produced the governing Plan Document,

Summary Plan Description, or BCBS IL Certificate of Coverage at any point in this matter, despite Plaintiff's written document request of December 9, 2024 (addressed directly to BCBS IL) and despite BCBS IL's independent receipt, by CC Services' own admission, of a forwarded copy of Plaintiff's counsel's May 2025 inquiry and renewed document request. The only production of those documents came from the Committee, acting through CC Services, on May 20, 2025, more than a year after the services were performed and more than five months after the original request, and even then, without the Committee or BCBS IL ever identifying the anti-assignment provision, the forum-selection clause, or the contractual limitations period as provisions Plaintiff should take note of. Defendants have thus waived, and are equitably estopped from asserting, any anti-assignment provision, forum-selection provision, contractual limitations period, or other restrictive provision contained in those documents. Defendants cannot withhold governing plan documents entirely or provide them late throughout the administrative process, despite direct and repeated notice of a claimant's request for them, and later attempt to invoke undisclosed provisions as a litigation defense after a claimant's appeal rights have expired.

119. Finally, Plaintiff's Assignment of Benefits is not limited to the mere right to receive direct payment; it expressly appoints Detox LA "to act as [Patient H's] representative and on [his] behalf in any proceeding that may be necessary to

seek payment from [his] insurance carrier." An assignment of the right to receive payment of benefits generally includes the limited right to sue for non-payment, even where the assignment does not expressly reference litigation. *S. Coast Specialty Surgery Ctr., Inc. v. Blue Cross of Cal.,* 90 F.4th 953 (9th Cir. 2024); *DB Healthcare*, 852 F.3d at 876-77 & n.7. Here, that right is conferred expressly, removing any doubt that Plaintiff's Assignment of Benefits encompasses the derivative right to bring this action.

## IX. PLAINTIFF'S CLAIM IS TIMELY UNDER THE PLAN'S OWN CONTRACTUAL LIMITATIONS PERIOD; DEFENDANTS HAVE WAIVED, AND ARE ESTOPPED FROM ASSERTING, ANY LIMITATIONS PERIOD, FORUM-SELECTION CLAUSE, OR OTHER LIMITING PROVISION THEY FAILED TO TIMELY DISCLOSE

120. On information and belief, the Plan's own Certificate of Coverage provides that "[n]o legal action may be brought to recover under this Certificate, prior to the expiration of 60 days after a Claim has been furnished to Blue Cross and Blue Shield . . .. In addition, no such action shall be brought after the expiration of 3 years after the time a Claim is required to be furnished to Blue Cross and Blue Shield, in accordance with the requirements under this Certificate." The same Certificate provides that "[c]laims should be filed with Blue Cross and Blue Shield

on or before December 31st of the calendar year following the year in which" the covered service was rendered.

121. Patient H's services were rendered between February 23, 2024, and March 7, 2024. Under the Plan's own terms, any claim for those services was "required to be furnished" to BCBS IL on or before December 31, 2025, which is the calendar year following the year in which the services were rendered. Applying the Plan's own three-year limitations period from that date, Plaintiff's claim does not become time-barred until December 31, 2028. This action, filed well before that date, is timely.

122. Plaintiff's claim is timely under any other accrual date that might be proposed as well. Measured from the dates of service themselves (February 23 through March 7, 2024), from the dates BCBS IL actually issued its original claim determinations in 2024 (March 29, April 12, and April 19, 2024), or from BCBS IL's own stated "initial decision date" of April 10, 2025 (however unreliable, as alleged above), a three-year contractual limitations period would not expire until, at the earliest, 2027, and, under BCBS IL's own stated date, 2028. Plaintiff's claim is timely measured from any date BCBS IL might propose.

123. Independent of its timeliness under the Plan's own terms, Defendants have waived, and are equitably estopped from asserting, any contractual limitations period as a defense to this action. At no point during the extensive administrative

proceedings described above, not in the original 2024 EOBs, not in the June 10, 2025 letter, not in the September 9, 2025 letter, and not in the September 15, 2025 letter, did either Defendant ever identify, cite, or rely upon any contractual limitations period contained in the Plan's Certificate of Coverage as a basis for denying or limiting Plaintiff's claim. BCBS IL never itself produced the Certificate of Coverage containing that provision at any point in this matter; the only production of the governing Plan documents came from the Committee, acting through CC Services, a non-party, on May 20, 2025, more than a year after the services were provided and more than five months after Plaintiff's initial written request for those documents. On information and belief, the Plan's own coverage compounds this prejudice. The Plan requires that a notice of appeal determination state the "timeframes from the date of the adverse determination" for a member to appeal or seek external review, and that this be explained, "regardless of the status of a provider appeal." Defendants could not comply with this requirement even if they tried: as alleged above, BCBS IL's own four written responses could not agree among themselves on what the "adverse determination" date even was. A Plan-mandated disclosure that depends on a single, ascertainable date cannot be satisfied by an administrator that supplies three different dates for the same underlying determination, and Defendants cannot now invoke any limitations period measured from a date they were never able to identify consistently in its own correspondence.

124. Defendants have likewise waived, and are equitably estopped from asserting, the forum-selection clause. As alleged earlier in this Complaint, Defendants failed to timely furnish Plaintiff a copy of the Plan documents containing that clause, and neither Defendant ever raised nor relied upon that clause in any of their own correspondence with Plaintiff at any point during the administrative process.

125. Defendants have waived, and are estopped from enforcing any forum-selection clause in the Plan. Defendants did not raise or identify any forum-selection clause to Plaintiff at any point during the administrative claims and appeal process. Defendants did not provide the text of the clause until the Committee's delayed production on May 20, 2025—even then the Defendants did not identify or point out the forum selection clause. Plaintiff pursued its administrative remedies, and prepared to bring this action, without notice of the clause [and in reliance on Defendants' failure to identify it.] Having withheld the clause while Plaintiff pursued those remedies, Defendants should not now be permitted to invoke it to require that this action be litigated in a different forum other than the California Central District Court.

126. More broadly, Defendants have waived, and are equitably estopped from asserting, any other limiting provision contained in the Plan documents, including, without limitation, any exclusion, restriction, mandatory dispute-

resolution requirement, or other condition on coverage or on Plaintiff's right to sue. Further, Defendants failed to identify, cite, or disclose to Plaintiff at any point during the administrative process described above. This includes the discretionary-authority clause framework detailed in this Complaint: whatever deference that clause might otherwise invite, Defendants never informed Plaintiff, at any point during the administrative process, that they were exercising discretionary authority in adjudicating Plaintiff's claim, and never explained how any such discretion was exercised in arriving at the "priced amount" rationale or the $525.00 average daily allowance described above. Defendants cannot withhold the very documents containing their defenses for the better part of a year, never mention those defenses in four separate written responses, and then invoke them for the first time in this litigation. Any such undisclosed provision, whatever its nature, is waived.

## X. DEFENDANTS' PROCEDURAL VIOLATIONS WARRANT DE NOVO REVIEW

127. In the Ninth Circuit, courts apply a multi-step framework to determine whether de novo review or abuse-of-discretion review applies to an ERISA benefit determination. The first question is whether the plan unambiguously grants the administrator discretionary authority to determine eligibility for benefits or to construe plan terms; general authority to administer the plan or pay benefits is not enough. *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 963 (9th Cir. 2006) (en

banc). If not, de novo review applies by default. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The burden is on the plan administrator or insurer to prove that discretionary authority was clearly and unequivocally granted. *Simkins v. NevadaCare, Inc.*, 229 F.3d 729, 733 (9th Cir. 2000).

128. Even where discretionary authority is established, a court must examine whether the administrator substantially complied with ERISA's procedural safeguards, including those set forth in 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1. These procedural safeguards include timely notice, clear explanations of denials, citations to the specific plan provisions relied upon, disclosure of the reimbursement methodology applied, and a meaningful opportunity for review. The Department of Labor has confirmed that even a partial payment constitutes an adverse benefit determination triggering these obligations, including disclosure of cost-sharing terms and reimbursement methodology. *See* ERISA Claims Procedure Regulation: Final Rule, 65 Fed. Reg. 70,246, 70,255 (Nov. 21, 2000); FAQs About the Benefit Claims Procedure Regulation, U.S. Dep't of Labor (2002), Q&A-7.

129. Where an administrator fails to comply with these procedural requirements in a "wholesale and flagrant" manner, courts disregard any discretionary authority and apply de novo review. *Abatie*, 458 F.3d at 971-72; *Saffon v. Wells Fargo & Co. Long Term Disability Plan,* 522 F.3d 863, 872 (9th Cir. 2008). De novo review is warranted, for example, where an administrator fails to timely

decide a claim, *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1106 (9th Cir. 2003); where an administrator shifts its stated justification between an initial determination and a later one, *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc.,* 125 F.3d 794, 799 (9th Cir. 1997); or where an administrator fails to issue a reasoned final decision on appeal, *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631 (10th Cir. 2003) ("deference to the administrator's expertise is inapplicable where the administrator has failed to apply his expertise to a particular decision").

130. If no such flagrant violation is found, a court next considers whether the administrator operated under a conflict of interest. When the same entity both evaluates and pays claims, that conflict does not eliminate deference but requires heightened skepticism in applying abuse-of-discretion review. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115-17 (2008). A conflict may justify little or no deference where procedural irregularities, such as inconsistent explanations, failure to investigate, or other indicia of bias, suggest the process was tainted. *Abatie*, 458 F.3d at 965-69; *Salomaa v. Honda Long Term Disability Plan,* 642 F.3d 666, 676-77 (9th Cir. 2011) (repeated procedural violations rendered a denial arbitrary and capricious).

131. Under de novo review, no deference is given to the administrator's decision; the court independently evaluates whether benefits are owed under the plan's terms, construing ambiguities against the insurer. *Kearney v. Standard Ins.*

*Co.*, 175 F.3d 1084, 1094 (9th Cir. 1999) (en banc); *Simkins,* 229 F.3d at 734-35. Abuse-of-discretion review without heightened skepticism applies only where the plan clearly grants full discretion, the administrator substantially complies with all ERISA procedural requirements, and no conflict of interest exists. Even then, the decision must be logical, plausible, and supported by the administrative record. *Salomaa*, 642 F.3d at 676-81 (procedural irregularities remain a significant factor in that analysis, since deference requires a fair, reasoned, and procedurally sound decision) (citing *Abatie,* 458 F.3d at 974).

**a. <u>Defendants' Conduct Justifies De Novo Review</u>**

132. BCBS IL's handling of Patient H's claim reflects serious procedural irregularities warranting de novo review. BCBS IL's own pre-admission verification of benefits was not framed as a tentative plan summary; it was presented as a definitive statement of coverage and reimbursement terms, including the applicable "Rate Type," on which Plaintiff reasonably relied in admitting Patient H. BCBS IL thereafter issued original 2024 EOBs applying inconsistent, unexplained adjustments — Codes 001, 204, 067, and 038 — and, more than a year later, abandoned that rationale entirely in favor of an unrelated and equally unexplained "priced amount" rationale under Decision Code T43. This is precisely the kind of shift in stated justification between an administrator's earlier and later determinations that independently warrants de novo review. *See Lang*, 125 F.3d at

799.

133. As alleged throughout this Complaint, BCBS IL failed to satisfy the specific requirements of 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1: it did not provide "the specific reason or reasons for the adverse determination," did not cite "the specific plan provisions on which the determination is based," and did not describe any internal rule, guideline, or methodology relied upon. Its denials were vague, conclusory, and unsupported by any Plan-based explanation, and were flatly inconsistent with the coverage representations BCBS IL itself made during pre-admission verification. This contradiction, combined with BCBS IL's inability to consistently state even the date of its own decision or the dollar amount in dispute across four separate written responses, constitutes a wholesale violation of ERISA's claims procedures. *Saffon*, 522 F.3d at 872.

134. Independent of the deficient Explanations of Benefits, the Defendant Plan Administrator's wholesale failure to produce the governing Plan instruments for one hundred thirty-two (132) days past the statutory deadline constitutes a flagrant, bad-faith procedural violation of ERISA. By maintaining complete administrative silence and withholding the very documents containing its purported defenses, the Plan Administrator structurally blinded Plaintiff during the critical administrative appeal window. Under *Abatie*, 458 F.3d at 971-72, such severe, non-disclosure stonewalling strips Defendants of any administrative deference, renders

the underlying benefit denials fundamentally unreliable, and mandates that this Court review Plaintiff's claims under a de novo standard of review.

135. As the Ninth Circuit has emphasized, "the insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand; if it fails to do this, it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence." *Simkins*, 229 F.3d at 733 (quoting *Kunin v. Benefit Tr. Life Ins. Co.*, 910 F.2d 534, 540 (9th Cir. 1990)). BCBS IL's undefined "priced amount" rationale, described in Sections V and VI above, is exactly the kind of self-created ambiguity *Simkins* and *Kunin* hold cannot be used to BCBS IL's advantage.

136. BCBS IL also operated under a structural conflict of interest. On information and belief, BCBS IL both administered the pre-admission verification and claims-adjudication process and, as the insurer of medical benefits under this fully insured Plan, bears the financial liability for the benefits it adjudicates. This dual role of verifying coverage, pricing claims, and issuing the EOBs and appeal determinations that limit BCBS IL's own financial exposure creates exactly the kind of structural conflict that warrants heightened scrutiny under a de novo, or at minimum a heightened-skepticism abuse-of-discretion, standard of review. *Glenn*, 554 U.S. at 115-17; *Abatie*, 458 F.3d at 968-69.

137. BCBS IL's own four written responses to Plaintiff's appeal, the June

5, June 10, September 9, and September 15, 2025, letters described above, together with BCBS IL's failure to respond at all for nearly six months beforehand, could not even agree among themselves on the date of BCBS IL's own decision or the dollar amount purportedly owed. That internally contradictory adjudication reflects an arbitrary and unreliable review system and independently supports de novo review of BCBS IL's benefit determination.

138. BCBS IL bears the burden of establishing that the Plan contains clear, unambiguous language granting it discretionary authority sufficient to displace the default de novo standard. To the extent BCBS IL relies upon discretionary language contained in documents it withheld from Plaintiff throughout the administrative process, BCBS IL is barred by waiver, equitable estoppel, and principles of fundamental fairness from relying on that undisclosed language to obtain a more deferential standard of review.

139. In the alternative, if the Court applies abuse-of-discretion review notwithstanding the procedural violations described above, it must do so with heightened skepticism. BCBS IL's structural conflict of interest is compounded by serious procedural irregularities, contradictory benefit representations, the absence of any Plan citation for its determinations, and the abandonment of its original rationale in favor of an unexplained new one more than a year later, that together taint the integrity of BCBS IL's determination and preclude meaningful deference.

*Salomaa*, 642 F.3d at 676-77.

**COUNT ONE**

**(Enforcement Under 29 U.S.C. § 1132(a)(1)(B) For Failure To Pay ERISA Plan Benefits And For Recovery Of Reasonable Attorney's Fees And Costs Under 29 U.S.C. § 1132(g)(1))**

**(Against all Defendants)**

140. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

141. Proper defendants under 29 U.S.C. § 1132(a)(1)(B) include the ERISA plan and any entity that exercises authority over the administration of benefits or is responsible for making benefit determinations and paying claims under the Plan.

142. This cause of action arises under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), which permits a participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

143. Plaintiff, as the valid assignee of Patient H's rights under the Plan, stands in Patient H's shoes for purposes of this claim. *DB Healthcare, LLC v.*

*Blue Cross Blue Shield of Ariz., Inc.*, 852 F.3d 868, 876 (9th Cir. 2017).

144. Patient H was, at all relevant times, a participant or beneficiary under the Plan, an employee welfare benefit plan governed by ERISA, with medical benefits insured and administered by Defendant BCBS IL.

145. BCBS IL failed to pay the full amount of the benefits that were due under the terms of the Plan for the medically necessary, pre-authorized services Plaintiff provided to Patient H, and failed to articulate a legitimate, Plan-based rationale for that underpayment, in violation of the terms of the Plan and 29 C.F.R. § 2560.503-1.

146. The Committee is also a properly named Defendant under this Count, independent of the conduct alleged against BCBS IL above. As the Plan's designated Administrator and agent for service of legal process, the Committee maintains ultimate control over the governance of the Plan, making it a proper party from whom benefits due under the Plan's own terms may be recovered under 29 U.S.C. § 1132(d)(1), and from whom statutory disclosure penalties may be extracted under 29 U.S.C. § 1132(c)(1)(B).

147. As a direct and proximate result of BCBS IL's conduct, Plaintiff has been damaged in an amount to be proven at trial but believed to be no less than $71,950.00, representing the difference between the amount billed for medically necessary services and the amount actually paid by BCBS IL reduced

by the coinsurance and deductible, plus applicable interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Detox LA, LLC, as the valid assignee of the participant in the fully insured ERISA Plan, respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

1. Pursuant to 29 U.S.C. § 1132(a)(1)(B), an award of monetary damages in the number of benefits due under the terms of the applicable ERISA Plan, including payment for medical detox treatment services rendered to Patient H. Defendants, through their authorized representatives, expressly represented that reimbursement would be issued at a certain rate. Plaintiff rendered services in reliance on that representation, and Defendants refused and failed to pay Plaintiff's claim in accordance with the Plan terms. Plaintiff is entitled to recover the underpaid amounts accordingly.

2. Pursuant to 29 U.S.C. § 1132(g)(1), an award of reasonable attorneys' fees and litigation costs incurred in connection with this action, as appropriate considering Defendants' improper denial of benefits and violations of ERISA's disclosure and claims procedure requirements.

3. An award of prejudgment interest on all unpaid or wrongfully withheld amounts at the rate of 9% per year, as provided under the Plan for amounts unpaid more than 30 days after receipt of all Claim information, or at the maximum legal

rate, whichever is greater, and post-judgment interest pursuant to 28 U.S.C. § 1961 from the date of entry of judgment until full satisfaction thereof.

4. Any additional legal or equitable relief as the Court may find just, proper, and necessary to enforce Plaintiff's rights under ERISA and to remedy Defendants' violations.

**Dated:** October 6, 2026, Respectfully submitted,

**HAKAKIAN WILLIAMS LAW GROUP PC**

By: /s/ Mina Hakakian

Mina Hakakian,
Attorneys for Plaintiff Detox LA, LLC